UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                                    Plaintiff,<br><br>v.<br><br>JEFFREY MICHAEL VUYTOWECZ,<br><br>                                    Defendant. | Case No.  17cr2687-JAH<br><br>**ORDER GRANTING MOTION TO SUPPRESS EVIDENCE** |

## **INTRODUCTION**

Pending before the Court is Defendant Jeffrey Vuytowecz's (Defendant, Vuytowecz) motions to Suppress Fruits of an Illegal Arrest and the Suppress Fruits of an Illegal Search.  The United States opposed the motions.  The Defendant has filed a reply. The Court held an evidentiary hearing. Based upon the pleadings, the Defendant's declaration, evidence obtained during the evidentiary hearing and arguments of counsel, the Court GRANTS Defendant's Motion to Suppress Evidence.

## **FACTS**

On August 1, 2017, a dispatch was received by the Vista Fire Department and deputies of the San Diego County Sheriff's Department regarding a reported residential

structure fire[1] located at the intersection of Crescent and Civic Center Drive in Vista, California. Doc. No. 56 at 8. The Fire Department and the Sheriff's Department were dispatched together. Doc. No. 56 at 23; Doc. No. 57 at 99. Deputy Tyler Eikermann (Eikermann) was the first responder to arrive at a residence on Crescent (the neighbors, neighbors' residence). Doc. No. 56 at 11. Eikermann proceeded directly into the backyard and to the rear fence. Doc. No. 56 at 10. While in the backyard, Eikermann observed the neighbors utilizing a water hose to spray water over the fence in the direction of an area where smoke was emanating. Id. He did not see any flames. Doc. No. 56 at 27. Eikermann attempted but could not see into Defendant's backyard due to a significant number of bushes and trees lining the fence. Doc. No. 56 at 10, 26. As he departed the neighbors' residence, he communicated an "update" as to a change of address of the emergency call to the fire department. Doc. No. 56 at 11.

Fire Captain Justin Golden (Golden, Captain Golden)[2] was the first fire department responder to arrive at the neighbors' residence after the initial broadcast alerting to a residential structure fire. Doc. No. 57 at 8. Part of his duties was to respond to mitigate hazards and verify the hazard is mitigated. Doc. No. 57 at 23. Upon arrival, he noticed a Sheriff's patrol car at the scene. Doc. No. 57 at 9. In attempting to locate the fire, Golden- as did Eikermann - proceeded directly into the neighbors' backyard to the area where he observed smoke coming from the other side of the neighbor's rear fence, fire charred bushes, and the neighbors spraying water with a garden hose over the fence in the direction of the smoke.

---

[1] This Court interprets the Supreme Court's reference to a burning building to mean a business or commercial dwelling, or a residential structure fire. Indeed, the Ninth Circuit has applied the Tyler rationale in the context of the search of a home. See United States v. Echegoyen, 799 F.2d 1271 (9th Cir. 1986) ("Although Tyler did not involve the search of a home, our case law has applied it").
[2] Golden is an experienced firefighter with nearly 13 years of experience with the Vista Fire Department, with more than 5 of those years in the position of Captain. R 140-141. He performed duties as a volunteer with the Ramona Fire Department before his employment with the City of Vista. Id.

Golden was able to see over the fence and observe Defendant with "a garden hose putting water on a hole in the ground" and he "did not see any flames". Doc. No. 57 at 10-11. He observed "a little bit [of] steam and smoke" coming from the hole. Id. Golden also observed the reported fire was not a structure fire. Doc. No. 57 at 11, 13, 25. Even though Defendant told Golden the fire was out, Doc. No. 57 at 11, Golden did not have to believe Defendant's assessment. The fire department has to adjust its response capabilities based upon the season, such as high fire season, that may require more fire assets. Doc. No. 57 at 23-24. While on the scene, Golden makes that assessment at the scene and re-assessed the dispatched emergency, based upon his observations of the circumstances and his experience.[3] Doc. No. 57 at 24. In order to determine whether the fire was out, his job was to make sure it was not emanating a large amount of heat or still smoking. Doc. No. 57 at 26. While the steam and smoke did not verify the fire was out, it informed Golden that the previous fire was contained but not necessarily 100 percent mitigated. Id.

Golden's post-arrival assessment was that the small fire that was actively being extinguished changed the circumstances. Doc. No. 57 at 25. Golden found it to have been "just a small fire in the backyard" that had been contained but not necessarily 100% extinguished. Doc. No. 57 at 26. He opined that time was not of the essence to address the threat of the reported fire. Doc. No. 57 at 25. Golden sent out a radio broadcast cancelling all other responding units, advising that the fire was an extinguished rubbish fire in the backyard. Doc. No. 57 at 11-13, 33. Golden directed his crew to re-locate the engine around the corner closer to Defendant's residence. Id.

Golden then approached the Defendant's residence with Eikermann at approximately 13:31:00. Doc. No. 57 at 14. During the walk, Golden has a conversation

---

[3] Golden did not testify as an expert. However, in light of his training and experience, along with being the most experienced firefighter on scene, his lay opinion is very "helpful to a clear understanding of the determination of fact(s) in issue". Fed. R. Evid.701; See, generally, United States v. Von Willie, 59 F.2d 922,929 (9th Cir. 1995).

with Eikermann. Id. Seconds later, Deputy Kyle Klein approaches. Doc. No. 57 at 15. Eikermann, Klein and Golden walked up to defendant's front yard in a very causal and leisurely manner. Doc. No. 56 at 38, 102-103; Doc. No. 57 at 15-16. Merrifield arrived approximately one minute later. Doc. No. 56 at 104. Golden later met with the deputies and had a conversation with them at the side gate. Doc. No. 57 at 12-13.

Among the first actions taken by Eikermann upon entering Defendant's front yard was to attempt to notify the residents by knocking on the front door and looking into the windows. Doc. No. 56 at 11. Eikermann radioed dispatch to check the license plates of a vehicle located in the front yard. Assuming that the homeowner was asleep inside, he and Klein traversed from one side of the residence to the other, knocked on the front door again and attempted to look into the windows, all in an effort to contact the homeowner due to the possibility of the fire spreading to neighboring properties. Doc. No. 56 at 12.

Approximately three to four minutes later, Defendant met the deputies at the side gate of his residence.[4] The side gate served as the entry to the backyard. After the deputies advised that the fire department needed to enter the backyard to ensure the fire was out, Defendant stated clearly, he did not consent to entry. Doc. No. 56 at 75. Defendant warned that his dog (later identified as Blitz) was loose in the backyard, that Blitz was an aggressive dog, and that the deputies needed to watch out for it because he did not know how his dog was going to react to the deputies. Doc. No. 50 at 5, 7; Doc. No. 56 at 76; Doc. No. 57 at 100. Yet, the deputies did not request Defendant to secure Blitz or provide commands to allow the deputies to do so because Defendant was uncooperative. Doc. No. 50 at 17-18.

Thereafter, as Defendant presented himself fully to the officers from behind the side gate, Deputy Eikermann, standing about 20 feet away, observed that Defendant had a

---

[4] Klein testified that he arrived on scene, he walked to the house and observed Defendant behind the fence, and they were looking at one another. Doc. No. 57 at 100. Eikermann testified that the property had a fence surrounding it, making it nearly impossible to see through or to see into the backyard. Doc. No. 56 at 11.

4

sheathed, fixed blade knife attached to his fanny pack, and warned his fellow deputies.[5] Doc. No. 56 at 18, 33. Defendant then removed the knife from the sheath without threatening its use, and immediately dropped it upon command. Doc. No. 56 at 32-33, 44, 77, 121. Defendant did not waive or brandish the knife toward any deputy and did not verbally indicate he intended to harm any deputy. Doc. No. 56 at 32-33. Eikermann and other deputies pulled their weapons in response. Id. The knife was a legal one, and a subsequent pat-down produced no other weapons. According to Klein, he handcuffed Defendant and assisted Defendant to the ground after the Defendant refused to sit on the ground. Doc. No. 56 at 34; Doc. No. 57 at 115.[6] The knife encounter occurred "within a minute ... it all happened very fast." Doc. No. 56 at 78. According to Klein, Defendant was detained because, in addition to the situation being uncommon for an individual to pull out a knife, Defendant initially was argumentative with the deputies and did not want deputies on his property. Doc. No. 57 at 102.

After Defendant was placed in the patrol car, Doc. No. 56 at 77, Merrifield and Klein entered the backyard. Doc. No. 50 at 14; Doc. No. 56 at 81-82. But before the deputies entered the backyard, Merrifield did not see any smoke emanating from the backyard while in Defendant's front or side yard. Doc. No. 56 at 36. Eikermann wasn't paying attention as to whether smoke was emanating from the area of the previous fire. Doc. No. 56 at 11-12, 36. Golden could not see the location from the side yard but did not testify he saw any smoke emanating from the backyard. Doc. No. 57 at 35. Only Klein testified he saw grey smoke prior to entry. Doc. No. 57 at 109.

Upon entering the backyard, Klein and Merrifield proceeded with caution, "trying to gauge the dog and how the dog would react. Doc. No. 56 at 81-82, 91.[7] "They walked

---

[5] This incident will be referred to hereafter as the "knife encounter".

[6] Defendant asserts Klein tackled him, taking him to the ground. The Court need not address Defendant's assertion of a Fourth Amendment, excessive force violation for purposes of this motion.

[7] Merrifield proceeded with caution because he previously was bitten in the line of duty. Doc. No. 56 at 81.

slow". Doc. No. 50 at 8. They observed the dog really wasn't doing anything. Id. The dog "seemed kind of interested in what [the deputies] were doing". Id. The first thing Klein and Merrifield did was proceed directly to inspect the site of the fire because "that was the main issue- the main threat to us at the moment," and "made sure there was no active fire". Doc. No. 56 at 82. Merrifield noticed the fire was still smoldering, Id., but they confirmed the fire was not a house fire and that the fire was out. Doc. No. 56 at 91; Doc. No. 57 at 110. The deputies then turned their full attention to Blitz. Doc. No. 56 at 82, 88-89, 91-92.

During the entire time Merrifield and Klein were in the backyard, Blitz was loose. Doc. No. 56 at 97. At no time did Blitz demonstrate any aggressive behavior or tendencies towards the deputies, attempt to bite or attack them or exhibit any behavior causing the deputies to fear for their lives. Doc. No. 50 at 15-16[8]; Doc. No. 56 at 83-84, 86, 97-98, 245-246; Exhibit 2(i). There was no evidence presented that Blitz was barking, acting defensively or presenting as being territorial in any way - despite general concerns held by Merrifield at the time of entry due to his prior negative experience[9], Doc. No. 56 at 81 - while Merrifield and Klein walked to and from the site of the previous fire.[10]

Nonetheless, Merrifield and Klein "attempted to corral [Blitz] or call him over". Doc. No. 56 at 89. Blitz displayed a friendly and harmless attitude toward the deputies and demonstrated indications of beginning to abide by and positively respond to the deputies. Id. But ultimately "the deputies called Blitz "over and put him into" the garage. Id. The Court finds at this point, Klein opened the garage door[11] and made the observations leading to Defendant's arrest and the filing the instant motions.

---

[8] Once in the backyard, the deputies observed extension cords running from the site where the generator was buried. Doc. No. 56 at 86. Klein also observed extension cords in the garage. Doc. No. at 10; Doc. No. 57 at 105. The extension cords ran from the site of the generator area, under the security door and into the garage. See Exhs. K-1 and K-4.

[9] See fn.8, supra.

[10] Golden also testified he saw Blitz while at the side gate before anyone entered the backyard. He observed that Blitz did not demonstrate an aggressive behavior at the time. Doc. No. 57 at 34.

[11] The Court notes that exhibits K-1, K-3 and K-4 depict the backyard entry door to the garage as a standard, security screen door with see-through meshed fabric designed to emit daylight and provide for

Golden then gained access to the backyard. He "went over to the site where he observed the defendant putting water on the hole in the ground. He verified that the fire was out, and that it hadn't extended into any surrounding vegetation. Doc. No. 57 at 19. Golden did not need to apply any water to it or use any equipment because there was no fire. Id. He also determined there was no danger, no bodily injury, no major property damage and no indication of arson. Doc. No. 57 at 20. Once he made these assessments, he left the scene in a fire department sedan. (Doc. No. 157 at 23-24; Exh. L, 13:41:5) Golden did not see a dog while in the backyard. Doc. No. 57 at 31.

After Golden departed, Klein called detectives concerning the contraband he observed in the garage. ECF 50 at 11; Doc. No. 57 at 106-107. San Diego Sheriff Department Detective Bogar Ortiz responded to Klein's call, arriving at 14:44:55. Doc. No. 57 at 40, 55. Ortiz obtained a briefing from the deputies. Doc. No. 57 at 41, 51. The weapons and other evidence were removed after a protective sweep. Doc. No. 57 at 55-56, 68-69]. In his affidavit to support authorization to obtain the search warrant, Ortiz utilized statements from the deputies who told him that the dog was placed into the garage "because he was aggressive". Doc. No. 57 at 51-52, 67. Ortiz based the affidavit to the search warrant on statements obtained from Klein. Doc. No. 57 at 152.[12] The warrant was obtained at 16:20 and executed at approximately 17:00:00, whereupon additional Marijuana was found. Doc. No. 57 at 53.

Later, during the execution of the search warrant, Blitz was not in the kennel and not leashed, but allowed to roam in the backyard. Doc. No. 57 at 50. The door of the garage was open, and Blitz moved about inside and outside of the garage, wagging its tail and continuing to display no aggressive behaviors towards the officers. Doc. No. 56 at 58; Doc. No. 66 at 43-45. Photographs were taken of Blitz as he roamed in and out of the garage

---

open ventilation through its fabric. The Court finds this type of door allows one to smell odors, or sense heat emitting, from the garage area without necessarily entering. The garage door was not otherwise described by the evidence.

[12] The validity of the search warrant was not briefed and is not squarely before the Court.

during this time. Exh. K-1 through K-4. Humane Society Officer Lueschen also found Blitz to be very friendly, not aggressive and that he displayed no behavior that was concerning. Doc. No. 56 at 57, 60.[13]

The deputies were not equipped with body cameras on August 1, 2017. Doc. No. 56 at 28, Doc. No. 66 at 46. However, video from Defendant's home security surveillance system (Exhibit L) captured the activity occurring in the front yard. Doc. No. 56 at 19.[14] A review of the video[15] depicts Defendant initially in the front yard appearing as if to be looking for, or awaiting the arrival of, someone. He then removes himself from the front yard. Later, at 13:30:40, Eikermann and Golden are captured by the video walking very casually in their approach to Defendant's premises. Exh L, 13:30:01. It depicts Golden looking in Eikermann's direction and having a conversation with Eikermann. Id. Deputy Klein, the second law enforcement responder, arrives at 13:30:47, walking casually. Doc. No. 56 at 102. Golden then meets with the deputies. Merrifield arrives within a minute's time - walking casually.

At 13:32:14, Golden moves to a location in the driveway approximately 8 feet from the street and is speaking in the direction of the deputies. Doc. No. 57 at 16. At 13:32:33, Eikermann goes to the front yard of Defendant's home and broadcasts the license plate number of the white vehicle parked in the front yard to the dispatcher. Exh. L, 13:32:40. Eikermann then ascends the stairs to the front porch and looks into the windows. Between 13:32:36 13:32:50, Golden is observed speaking in the direction of the side gate. Klein

---

[13] While the Court recognizes the reasonableness of the deputies' actions for purposes of this motion must be determined before and at the time of the initial entry into the backyard, the Court finds Blitz's demeanor during the execution of the search warrant was consistent with descriptions of his demeanor as described by Golden prior to the initial entry by Merrifield and Klein, and as described by Merrifield and Klein after their initial entry.

[14] Exhibit L did not capture the events occurring at the side yard or backyard. To the extent the witness' accounts relating to the sequence of events differ from the sequence depicted in the video, the Court finds the video evidence more persuasive.

[15] The timer on the video is one hour ahead of the actual time. Doc. No. 57 at 21. For purposes of tis motion, the Court will use the time depicted in the exhibit. Designations within Exhibit L will be by time, not by clip numbers.

then emerges in the video and approaches the front of the home. At 13:33.09, Klein and Eikermann return to a location near Golden. Eikermann approaches the front yard of the residence again, then ascends the stairs, knocks on the front door and looks into the windows for the purpose of warning the occupants that there was a fire in the backyard. Doc. No. 56 at 12; Exh L at 13:33:14. A dog barks from within the home in response to the knocking. At 13:33:17, Golden stood in the driveway as deputies were walking around in the front yard. Doc. No. 57 at 16. At approximately 13:34:00, Eikermann approaches the side gate while on the porch. He was about 20 feet when he observed the knife. Between approximately 13:34 and 13:38, no movements are captured on video in the front yard. [16]

Thereafter, Eikermann walked away from the property, Exh L, 13:37:58, entered his patrol vehicle and drove into Defendant's driveway. At 13:38:48, nearly nine minutes after Eikermann and Klein initially arrived at Defendant's residence, Eikermann escorts Defendant to and places him in the back seat of the patrol vehicle. Doc. No. 56 at 77; Exhibit L at 13:38:48. While Defendant was being escorted, he was not resisting Doc. No. 56 at 127. At 1341.57, three minutes after Defendant was placed in the patrol car, Doc. No. 57 at 20-21, the video shows Golden in front of the home, speaking into a microphone located on his coat and then walking away from the scene. He enters a fire department sedan and drives away. Id; Exhibit L, 13:41:57.

Later, Detective Ortiz, Klein and Eikermann are depicted in the video continuously removing items subject to seizure from Defendant's home between 14:44 and 14:50. Doc. No. 56 at 109-115. Eikermann, while holding a camera, states "we need to get a picture of the big dog" ... because "that is gonna be the reason for everything". Doc. No. 56 at 115-116, 128; Exh L, 14:53:58.

9

Exhibit L also depicts all responders wore lapel radio communication systems to communicate with dispatch personnel. See, e.g., Exh L, at 13:32:40 (Eikermann), 13:41:57 (Golden).

## **LEGAL STANDARD**

The reach of the Fourth Amendment extends beyond the paradigmatic entry onto private property by law enforcement for law enforcement purposes. Michigan v Tyler, 438 U. S. 499, 504 (978). The protections also extend to intrusions by law enforcement to assist other government officials, including health, fire and building inspectors, who carry out functions involving the location and abatement of suspected public nuisances and the performance of routine periodic inspections. Id. Fourth Amendment protections check the 'well-intentioned but mistakenly overzealous executive officers in the exercise of their duties.' Arkansas v. Sanders, 442 U.S. 763 (1979). The Supreme Court has limited the reach of the exceptions to the warrant requirement to a few 'jealously and carefully drawn' situations in which a search may be conducted in the absence of a warrant. Id. These exceptions have been carefully delineated, and "the burden is on those seeking the exemption to show the need for it." Id. at 759 (citing United States v. Jeffers, 342 U. S. 48, 342 U. S. 51 (1951). See Chimel v. California, 395 U. S. 752, 395 U. S. 762(1969); Katz v. United States, 389 U. S. 357. Moreover, the court has limited the reach of each exception to that which is necessary to accommodate the identified needs of society. Id. at 760.

A prompt warrantless entry in an emergency situation is one of these exceptions. It allows responders to respond to emergency situations that threaten life or limb. Hopkins v. Bonvicino, 573 Fed.3d 752, 763 (9th Cir. 2009) (quoting United States v. Stafford, 416 Fed.3d. 1068, 1073 (9th Cir. 2005)). As Tyler points out, "It would defy reason to suppose that fireman must secure a warrant or consent before entering a burning structure to put out the blaze." Id. Without doubt, a burning building[17] clearly presents an exigency of sufficient

_____

[17] This Court interprets the Supreme Court's reference to a burning building to mean a business or commercial dwelling, or a residential structure fire. Indeed, the Ninth Circuit has applied the Tyler

17cr2687-JAH

proportions to render a warrantless entry reasonable. <u>Tyler</u>, 436 U. S. at 509. Where a search warrant is required to investigate the origin or cause of a fire, the government must show more than the bare fact a fire of underdetermined origin has occurred on the premises. <u>Tyler</u> at 506-507. Even if a fire victim can be deemed aware of the factual justification for an entry to investigate the fire, it does not follow that the victim will also recognize the legal authority for such an intrusion. <u>Tyler</u> at 508. When a responder demands entry without obtaining consent, the occupant has no way of knowing whether the law requires the inspection, no way of knowing the lawful limits of the official's power to search and no way of knowing whether the official is acting under proper authorization. Id. (citing <u>Camara v. Municipal Court</u>, 387 U.S. 523 at 532). Thus, a major function of the warrant is to provide the occupant with sufficient information to reassure him of the entry's legality. Id.

As such, the emergency exception, as is the case with the exigent circumstances exception, is narrow and its boundaries are rigorously guarded to prevent any expansion that would unduly interfere with the sanctity of the home. <u>Hopkins</u>, 573 Fed.3d at 763. The core of the emergency exception is proof of objectively reasonable grounds to believe "an emergency is at hand and immediate attention is required. <u>United States v. Cervantes</u>. 219 Fed.3d. 882 (9th Cir. 2000; See also <u>Brigham City v. Stuart</u>, 547 U. S. 398 (2006) (affirming the objectively reasonable test). Mere speculation is not sufficient to show exigent circumstances. See <u>United States v. Tarazon</u>, 989 F.2d 1045, 1049 (9th Cir. 1993). Rather, "[t]he government bears the burden of showing the existence of exigent circumstances by particularized evidence." Id. This is a heavy burden and can be satisfied "only by demonstrating specific and articulable facts to justify the finding of exigent circumstances." <u>Sandoval v. Las Vegas Metropolitan Police Dept.</u>, 756 F.3d 1154, 1164

---

rationale in the context to the search of a home. See, <u>Fisher v. City of San Jose Police Department</u>, 558 F.3d.1069 (9th Cir. 2009) ("Although Tyler did not involve the search of a home, our case law has applied it". <u>United States v. Echegoyen</u>, 799 F.2d 1271 (9th Cir. 1986).

(9th Cir. 2014); <u>LaLonde v. County of Riverside</u>, 204 F.3d 947, 954 (9th Cir. 2000. Additionally, "the presence of exigent circumstances necessarily implies that there is insufficient time to obtain a warrant; therefore, the government must show that a warrant could not have been obtained in time." <u>Tarazon</u>, 989 F.2d at 1049.

In <u>Michigan v. Clifford</u>, 464 U.S. 287 (1984), the United States Supreme Court recognized that <u>Tyler</u> stood for the proposition that reasonable expectations of privacy remain in fire-damaged property. Id. at 292. As stated in <u>Clifford</u>, the constitutionality of warrantless and non-consensual entries onto fire-damaged property normally turns on several factors: whether there are legitimate privacy interests in the fire damaged property that are protected by the Fourth Amendment; whether exigent circumstances justify the government intrusion regardless of any reasonable expectation of privacy; and whether the object of the search is to determine the cause of fire or to gather evidence of criminal activity. Id. The Supreme Court also found that "privacy expectations [in fire-damaged property] will vary with the type of property, the amount of the damage, the prior and continued use of the premises, and in some cases the owner's efforts to secure it against intruders". Id. at 292.

## **DISCUSSION**

In this case, it is undisputed that the Defendant had legitimate privacy interests in the subject property protected by the Fourth Amendment and Defendant expressly exercised his Fourth Amendment right by refusing to consent to the responders' entry into his backyard. The <u>Clifford</u> factors to be addressed herein are whether exigency circumstances justified the government intrusion regardless of any reasonable expectation of privacy; and whether the object of the search was to prevent a public nuisance or determine the cause of a previous fire.

The pivotal issue here is whether the deputies at the scene objectively believed an emergency or exigency existed to warrant the actions taken to enter Defendant's backyard. Defendant argues that there was no emergency or continuing emergency that justified the non-consensual, warrantless entry by deputies or Golden. The Government disagrees.

12

### a. There Was No Burning Residential Structure and the Initial Emergency Broadcast was Downgraded.

The evidence shows that upon hearing the broadcast of a structure fire, Eikermann and Golden separately proceeded with dispatch to the suspected scene of the fire. Upon approaching the neighbors' property, neither Eikermann nor Golden went to the neighbors' front door, knocked and/or looked into the windows to determine whether anyone was at home in order to warn them that there was a reported fire or of the impending danger they perceived based upon the initial broadcast. Instead, they proceeded directly into the backyard to confront the perceived hazard. According to Eikermann, he entered the neighbors' backyard without permission as he would do at any fire. Doc. No. 56 at 46.

Eikermann observed smoke coming from the other side of the fence, fire charred bushes and the neighbors spraying water with a water hose over the fence in the direction of the smoke. He also observed no blaze and no burning building or residential structure was initially broadcasted. See Doc. No. 56. Eikermann could not see into Defendant's backyard due to a significant number of bushes and trees that lined both properties. He communicated the change of address of the emergency call to all responders. Doc. No. 56 at 11. Even though Eikermann communicated an update relating to the actual location of the fire site, there is no evidence he communicated any other information he learned at the scene, including the fact the neighbors were dousing the fire. It is unclear whether Eikermann spoke to the neighbors to obtain information to facilitate an on-site, updated assessment.[18] However, even if Eikermann spoke to the neighbors, the Government presented no evidence relating to what Eikermann learned from the exchange and whether it informed Eikermann that an emergency was continuous in nature.

Unlike Eikermann, Golden, who arrived moments after Eikermann's departure, was able to see over the fence and observe the Defendant utilizing "a garden hose putting water

---

[18] Eikermann testified that he spoke to the neighbors utilizing the water hose, Doc. No. 56 at 24-25, and moments later testified he did not speak to the neighbors because he did not have time. Id. at 27.

on a hole in the ground. Golden also observed the reported fire was not a house on fire (Doc. No. 157 at 25) and he did not see any flames. Doc. No. 57 at 11. He noticed "a little bit [of] steam and smoke" coming from the hole. Id. Golden was able to determine from his experience that the site was not emanating a large amount of heat (Doc. No. 57 at 25-26) and the fire was nearly 100% extinguished.

As a result of his observations, Golden - an experienced firefighter on-site investigating the scene - assessed the situation as a small fire that was actively being extinguished that changed the circumstances. ECF 57 at 25. He opined that time was not of the essence to address the threat of the fire and that he needed only to confirm the fire was out and investigate the cause and origin of the fire. (Doc. No. 157 25-26).[19] Due to the changed circumstances, Golden sent out a radio broadcast cancelling all other responding units (Doc. No. 57 at 11-12, 23-24, 33), advising that the fire was an extinguished rubbish fire in the backyard. Doc. No. 56 at 11, 23-24, 33. The Government's argument that the officials reasonably believed the situation in Defendant's backyard presented an emergency or exigency does not align itself with the evidence. As such, the evidence shows that the circumstances had changed based upon Golden's observations in the neighbors' backyard.

b. **The Deputies Knew or Should Have known About The Downgraded Circumstances**

Emergency situations are fluid, not static, events.[20] Law enforcement officers cannot rely on an initial broadcast of an emergency and fail to obtain and/or consider an updated

---

[19] Golden did not testify as an expert. However, in light of his training and experience and his development of an understanding of fire science, Doc. No. 57 at 22, his lay opinion is very "helpful to a clear understanding of the determination of fact[s] in issue". Fed. R. Evid. 701; see generally, United States v. Von Willie, 59 F.2d. 922, 929 (9th Cir. 1995).]

[20] Golden testified that high fire season may call for more assets than in normal circumstances. Doc. No. 57 at 23-24. He stated the fire department adjusts its response based upon the season and circumstances. He has to make an assessment upon arrival at the scene. Doc. No. 57 at 24. Here, upon arrival on the scene, Golden made an updated assessment based upon updated facts that additional assets were not needed even though it was fire season at the time. Id.

14

assessment derived from newly discovered facts and circumstances to determine next courses of action.

In <u>Davis v. Washington</u>, a female contacted the 911 operator to report that her boyfriend assaulted her. 547 U.S. 813, 813-14 (2006). The boyfriend fled the scene of the alleged domestic violence and was not present when law enforcement arrived. <u>Id.</u> The Supreme Court held that while there was an emergency at the time the 911 operator received the call, the emergency appeared to have ended when the boyfriend fled the scene of the alleged assault. <u>Id.</u> at 828. Similarly, in <u>Hammon v. Indiana</u>, a companion case, police responded to a reported domestic disturbance at the home of Hershel and Amy Hammon. <u>Id.</u> at 813. When law enforcement arrived however, Amy assured them nothing was wrong and voluntarily allowed them to enter the dwelling. <u>Id.</u> The Supreme Court also held in <u>Hammon</u> that after the officers' arrival, the officers' assessment was no emergency in progress. <u>Id.</u> at 815. In both <u>Davis</u> and <u>Hammon</u>, the Supreme Court determined that there was no ongoing exigency or emergency situation because circumstances had changed from the time law enforcement received the initial call to the time of arrival on scene.

Although the facts in <u>Davis</u> and <u>Hammon</u> are distinguishable from the facts here, the overarching concepts regarding exigency and proper law enforcement responsiveness upon arrival to an emergency site overlap and are instructive. In this case, as in <u>Davis</u> and <u>Hammon</u>, law enforcement or first responders responded to exigent circumstances or an emergency situation. Further, in all three situations, the exigency subsided by the time law enforcement or first responders arrived on scene.

The Supreme Court has held that whether a situation constitutes an emergency "is a highly context-dependent inquiry." <u>Michigan v. Bryant</u>, 562 U.S. 344, 346 (2011). In <u>Bryant,</u> the Supreme Court held that "whether an emergency threatening the police and public is ongoing cannot narrowly focus on whether the threat to the first victim has been neutralized because the threat to first responders and public may continue." Id. at 345. Law enforcement is entitled to assess and reassess the scope and duration of the threat but

15

does not have unlimited discretion. Id. In this Court's view, a fair reading, or logical extension, of <u>Bryant</u>, <u>Davis</u> and <u>Hammon</u> is that an objective law enforcement officer/ first responder is *required* to reassess, as Golden did here.

Here, the responders failed to assess and reassess the scope and duration of the threat. They did not have unbridled discretion to respond as if there was no updated assessment or due to their failure to reassess. An initial broadcast of a blazing structure fire does not provide a green light under the Fourth Amendment for officers to proceed within a fixed state of mind of following established protocol in a vacuum. An objective, reasonable officer would not place his/her head in the sand and proceed with a programmed protocol without considering available updated information.

The evidence establishes the deputies and the fire department were dispatched together[21] so that both departments were aware of the size of the fire, the direction of the fire, structures threatened, where road closures needed to occur, whether structures needed to be evacuated, and when safe zones needed to be created for the fire department. Doc. No. 56 at 21-23; Doc. No. 57 at 99-100. After the initial broadcast, Eikermann sent out a broadcast to "update the fire department" that the fire was located at Defendant's residence. Doc. No. 56 at 11. The interconnection of the fire department and sheriff department systems is further demonstrated by Klein's belief receipt of and responding to of the change of location made by the fire department but initiated by Eikermann. Doc. No. 57 at 100. In addition to communication equipment in patrol vehicles, dispatch communication devices

---

[21] See, Eikermann's testimony: "we are usually dispatched together". Doc. No. 56 at 23); Merrifield's testimony: he received a radio call coming across about a structure fire in the area of Civic Center Drive – "dispatch put it out to the primary responding units". The radio call "was initially dispatched to one street, and then once the first deputy got there, he informed other responding units that it was actually a different location off of Civic Center". Doc. No. 56 at 73-74; and Klein's testimony: "Law enforcement as well as the fire department get dispatched to these calls because sometimes they need traffic control [and] sometimes they need help with dealing with the residents inside the house. Doc. No. 50, at 4. In addition, San Diego Humane Society Officer Sonja Lueschen, heard the initial broadcast while at her work station. Doc. No. 56 at 63.

16

can be observed on the lapel of each deputy in Exhibit L. And all three broadcasts occurred <u>before</u> the responders approached Defendant's residence. As such, the Court finds Eikermann, Klein and Merrifield knew or should have known the seriousness of the initial broadcast of a residential structure fire had been downgraded or modified to a near 100% extinguished rubbish fire from either Golden's broadcast to all responding units or by way of Golden's discussions with deputies while at Defendant's yard before entry into the backyard.

In addition, the actions and demeanor of the responders upon arriving at Defendant's residence demonstrate they were aware of the change of circumstances. In contrast to the approach of proceeding smartly toward and into the neighbors' backyard by Golden and Eikermann after the initial broadcast, after Golden downgraded the nature of the initial call-out of a burning structure, the record reflects all early responders - Golden, Eikermann, Klein and Merrifield - approaching Defendant's premises in a slow, casual and leisurely manner. Exh L, 13:30:02 to 13:31:14; Doc. No. 56 at 103–104, 123–124; Doc. No. 57 at 15-16; Doc. No. 66 at 44. There was no one running, walking briskly, yelling or screaming. Doc. No. 56 at 123-124. Exhibit L clearly depicts Golden speaking to Eikermann during their stroll to the property and later speaking in the direction of the deputies located at the side gate. Golden did not appear with a shovel or water hose in hand as if anticipating burning rubbish in the backyard that might spread to nearby homes. Golden also did not present to be 'standing at the ready' to enter the backyard to investigate whether the fire was completely extinguished. There were no firemen from Golden's engine visible on video and no evidence presented that the firemen were assembling water hoses from the engine or approaching Defendant's property with shovels or other firefighting tools, in preparation to fight an anticipated fire hazard that may threaten other property or lives. The casual approach by Eikermann and Golden - and later Klein and Merrifield - occurred before any notice of a potentially aggressive dog. First responders need not appear rushed or anxious to move directly toward an anticipated threatening harm. However, the only reasonable inference drawn from their actions and inactions here dispel any objectively

17

reasonable sense of urgency to attend to any perceived community harm. The record supports the deputies' knowledge of Golden's broadcast to all responders - the fire was a small bush fire that was nearly 100% extinguished.

The deputies' testimonies are also indicative of their knowledge of the downgraded assessment from radio communications or Golden's briefing, as opposed to possessing state of mind of the existence of an on-going emergency.[22]

It strains reality to believe that an experienced fire fighter in Golden's position, who had already broadcasted the fire was a rubbish fire that was nearly 100% extinguished, cancelled all other responding units via a shared dispatch, and is observed on video speaking to the deputies minutes before the confrontation at the side gate with the Defendant, would not have informed or briefed the deputies of his broadcast or his current assessment. Likewise, it strains reality for reasonable law enforcement officers not to seek updated information from available government officials having advanced training and experience involving the task at hand. [23]

The Court finds that an objectively reasonable first responder on the scene would have sought or obtained updated information concerning the current status of the original emergency call, occurring in real time to assess any continuous danger to the public or current exigency of the circumstances, in lieu of maintaining a static mindset originating from the first dispatch. To the extent the deputies did not seek out and/or learn of the current status of Golden's updated assessment of the threat level, especially in light of their video-captured casual undertakings before confronting the Defendant, they acted unreasonably.

---

[22] See, e.g., See, Doc. No. 56 at 75 (in seeking entry into the backyard, deputies told Defendant the fire department needed entry into the backyard to ensure the fire was out.); ECF 50 at 7, 10 (there was a need to evaluate the fire, where the fire came from or why it started).

[23] The Court notes that Klein testified that he did not know what to expect when he arrived at Defendant's yard, Doc. No. 57 at 99-100, 110, and that Golden did not tell him the fire was out. Doc. No. 50 at 14, Doc. No. 57 at 110. This testimony is not supported by the weight of the evidence. See also, fn 28, infra.

In this case, the evolving circumstances required reasonable law enforcement officers to modify their plan of action based upon an updated assessment.

### c. There Was No Updated Assessment of An Escalating Threat to Support a Reasonable Belief of a New Exigency or Emergency Before Entry into The Backyard

From the moment of the responders' arriving at Defendant's residence up to and including the moment they entered the backyard, there was no evidence presented that can be said to be consistent with a finding of an on-going or escalating exigency requiring immediate retry into the backyard. Eikermann did not remember whether he could still see any smoke or whether he was paying attention to signs of smoke upon entering Defendant's yard, Doc. No. 56 at 11-12, and did not remember whether he could see any smoke while at the side gate. Doc. No. 56 at 36. Merrifield did not testify he observed any smoke before entering the backyard. Golden stated he would have been concerned if the site of the fire was emanating a large amount of smoke or was still smoking. [24] Doc. No. 57 at 26. The Government presented no evidence that Golden, as the most experienced fire-related official at the scene, observed bellowing smoke - let alone any smoke at all - emanating from the rear of the residence and over the Defendant's fence or residence. Even though Eikermann and Golden testified it was a very hot day, there was no evidence that a 'hot day' in and of itself was concerning or whether other weather conditions (e.g. Santa Ana winds) were ripe so as to increase the possibility of burning embers - that radiate a substantial amount of heat – being carried in the hot winds, jumping to and threatening surrounding structures and property, or any other articulated factors that would have caused concern of a recurring threat or a continually concerning public nuisance.

---

[24] It follows that where Eikermann had time to obtain registered owner information relating to the vehicle in the front yard from the dispatcher, and he and Klein had time to move back and forth in the front yard, traverse to the opposite side of the residence, twice knock on doors and look into windows, they had sufficient time to seek an update from the experienced firefighter at the scene.

The Government also asserts the situation was 'hostile' and "chaotic", requiring prompt action. However, the evidence is inconsistent with this claim. As stated, the record reflects all early responders - Golden, Eikermann, Klein and Merrifield - approaching Defendant's premises in a slow, casual and leisurely manner. Exh L, 13:30:02 to 13:31:14; Doc. No. 56 at 103 – 104, 123 – 124. There was no one was running, walking briskly, yelling commands or screaming. Doc. No. 56 at 123- 124. And after the Defendant is subdued at the side gate, the surveillance video depicts Eikermann calmly walking from the side gate area, down the driveway and cross the street. He then drives his patrol vehicle without dispatch into the driveway. He retrieves the Defendant from the side gate area and places him in the vehicle without any visible sense of urgency, or visible indicators of struggle or resistance by Defendant. Other than the Defendant's assertion of his Fourth Amendment rights, there is no other evidence Defendant was aggressive toward or demonstrated any resistance to deputies. Merrifield testified events progressed relatively quickly and done in a hurry to try to get back there to get to the fire" and circumstances escalated after contact with Defendant. Doc. No. 56 at 120, 125. He pointed to Defendant's uncooperativeness; the fact he was not answering questions they wanted answered or was not helping them in the way they wanted to be helped; the deputies' interest in getting to a possible fire; Defendant's introduction of a weapon; and Defendant's failure to allow the deputies to do their job as contributing to the hostile and chaotic scene. Doc. No. 56 at 119, 124. While tempers may have escalated during the three to four-minute interaction with Defendant at the side gate, it cannot be said that an objectively reasonable officer would consider the overall circumstances including the knife incident which occurred in less than a minute and without the deputies being threatened to be hostile and chaotic.

Deputies also identified Defendant's uncooperativeness as contributing to the delayed entry. The Government relies on <u>Fisher v. City of San Jose</u>, 558 F.3d.1069 (9th Cir. 2009) in support of the proposition that the situation was hostile and chaotic and Defendant's lack of being cooperative contributed to the responders' delayed entry. The

deputies' only cited Defendant's exercise of his Fourth Ament rights as the uncooperativeness.

In <u>Fisher</u>, a San Jose police officer responded to a call informing that an individual, later identified as Fisher, pointed a rifle at a security guard in his apartment complex. When the officer arrived, an intoxicated Fisher pointed a weapon at her, threatened to shoot her, and then barricaded himself in his residence. Fisher was observed loading weapons and arranging them in strategic locations throughout his apartment to resist any attempted entry by police. Importantly, in <u>Fisher</u>, the officers had probable cause to believe Fisher had committed a crime upon the responding officer's initial encounter with him. Yet the officers continued to assess the circumstances before arresting Fisher. Twelve hours later, Fisher peacefully surrendering.

In this case, unlike in Fisher, there was no probable cause to arrest Defendant as a result of the knife incident. And this event occurred within a very short time period ("within a minute ... it happened all very fast", ECF 56 at 78, at 13:38:48), and nearly four minutes after Eikermann and Klein initially arrived at Defendant's residence. In addition, deputies did not seek commands from Defendant to kennel Blitz to expedite any entry. As the Defendant points out, he did no more than that, assert his constitutional rights, by denying consent and any asserted delay was the product of the deputies' own creation. And even if the asserted delay was caused by Defendant's exercise of his constitutionally protected rights or the knife encounter, these factors did not provide new information that an emergency was on-going.

> **d. After Entry Into The Backyard, The Observations Of The Deputies Presented Facts Requiring a Recognition Of An Updated Assessment That There Was No Longer An Emergency**

Even if an objectively reasonable officer believed initial entry into the backyard was still justified after the foregoing circumstances, the record does not establish the deputies' subsequent entry into the garage was objectively reasonable. Having in mind the Defendant's warnings concerning Blitz, and even though the deputies did not ask

21

Defendant whether there were commands to use to secure Blitz,[25] they entered the backyard through the gate, and proceeded on the sidewalk that winds around the garage, pass the dog, past the dog kennel and toward the area where the generator was buried. (Def. Exh. I-2; Doc. No. 56 at 95-97). Merrifield tried to gauge the dog and how he reacted to them. Doc. No. 56 at 91, 97. Klein testified that "our immediate goal was to evaluate the fire and where that came from and how that started." (Doc. No. 57 at 105). Merrifield testified he and Klein first checked the generator where the fire originated because "there was a fire, there had been a fire". Doc. 56 at 81-82, 91, 97. Both deputies acknowledged the fire was out. Doc. No. 56 at 81, 92.

Importantly, during this time, Blitz was loose in the backyard, and did not demonstrate any aggressive behavior towards - and did not attempt to attack - either deputy. Doc. No. 56 at 95-98; Doc. No. 57 at 111. Klein had no reason to fear for his life. Doc. No. 57 at 111. And as stated, no evidence was presented that Blitz was barking or defensive or territorial in any way while Merrifield and Klein walked to and from the site of the fire to inspect the site. To the contrary, Blitz did not exhibit any aggression toward Merrifield and Klein during this episode. (Doc. No. 56 at 83-84, 92, 97-98). These facts raise two significant legal issues. First, after discovering there was no fire, whether reasonable law enforcement officers would have re-assessed the perceived threat. And secondly, whether it was reasonable at that time to immediately secure Blitz for the fire department to inspect the former fire site.

Klein and Merrifield, after observing the fire was in fact out, knew or should have known the original fire site was not the 'significant threat' that initially caused them to arrive at Defendant's side yard. Knowing the circumstances had changed – there being no longer an imminent threat to abort - they did not re-assess the scope and real-time

---

[25] According to the deputies, Defendant was not consulted because he was uncooperative and was not answering questions the deputies wanted answered or helping in the way the deputies would like to be helped. Doc. No. 56 at 81, 90-91, 119, 244-245.

circumstances of the once perceived threat and did not report the updated information to the fire captain before he entered the backyard. In addition, having observed Blitz' non-aggressive nature as it roamed free in the yard during the inspection of the generator site and determining Blitz was not a threat to them, here was no exigency or other reason at that point to secure Blitz for the benefit of the fire department. The deputies acted unreasonably when they failed to report to Golden their updated findings concerning Blitz' non-aggressive, non-territorial behavior. An objectively reasonable responder (firefighter) would have considered the updated information to determine whether there was a fire hazard that continued to create an ongoing exigency or emergency or facts to ensure safe entry for inspection of the site. Such an update and re-assessment would have caused a reasonable responder like Golden to do what he in fact ultimately did - enter the backyard to determine the cause of the earlier fire. The Government has not demonstrated by any particularized evidence that there was not time at that point to obtain a warrant or there existed a significant risk of harm confronting Golden if the deputies did not secure Blitz.

Without doubt, Tyler permits a warrantless entry to inspect a fire-damaged structure for a reasonable time after responders enter the blazing structure to extinguish it. Tyler, 436 U.S. at 509. But here there was no blazing structure and no burning structure extinguished by responders. In fact, there were no flames at all witnessed by the responders.

To the extent the witnesses' testimony is designed to be suggestive of an exhibition of an act of heroism on the part of the deputies by moving toward the fire site without first securing the dog or to protect Golden, the Court is not convinced such an inference is appropriate here. Their actions and inactions from the moment they entered Defendant's yard dispel any notion that a display of heroism was necessary or reasonable to handle the task at hand. Even if there was an initial display of selfless heroism to enter the backyard in light of the Defendant's warnings, the need for any such heroism dissipated upon the deputies' observations that the dog presented no threat to responding personnel.

The assessments Golden could have made had he received these two updated assessments would have counseled the officials to obtain an administrative warrant. The

Government has not shown that under these circumstances, there was not enough time to obtain a telephonic warrant for an administrative inspection-related warrant to determine the cause of the extinguished fire. <u>Tarazon</u>, 989 F.2d at 1049. And as stated in Tyler, '[w]here the cause of the fire is undetermined, and the purpose of the investigation is to determine the cause and to prevent such fires from occurring or recurring, a search may be conducted pursuant to warrant issued in accordance with reasonable ... administrative standards or ... judicially prescribed standards. 536 U. S. at 508, citing <u>See v. Seattle</u>, 387 U.S. 544-545 (1967). Under the circumstances presented here, a judge could perform the important function of protecting the Defendant's privacy by keeping the intrusion to a minimum while permitting and maintaining the vital social objective of ascertaining the cause of the fire.

Considering these facts and circumstances existing before the officers entered the backyard of Defendant's residence, specifically including the knowledge and expertise of the fire captain, it was not objectively reasonable to believe that an emergency existed that fell within the realm of fire exigency.

### e. Klein's Testimony Concerning Securing Blitz First Is Not Supported by The Evidence

The Court acknowledges Klein's account of the activities occurring in the backyard differ materially from Merrifield's. According to Klein, he and Merrifield developed a pre-entry plan before entering the backyard. ECF 50 at 7, Doc. No. 57 at 101- 02. Klein testified that the first thing he and Merrifield did upon entering the backyard was to secure the dog. Doc. No. 50 at 15. Klein attempted to coax Blitz into his kennel. Doc. No. 8-9. Ultimately, after Klein discovered the door to the garage was unlocked, the deputies decided to place Blitz into the garage. Id. According to Klein, he opened the door to the garage, stepped inside in order to cause Blitz to follow, and immediately felt the intense heat which was about 15 degrees hotter than outside. ECF 50 at 9. Klein smelled the odor of marijuana, and then observed a hand gun located in an open box, a black tar-like substance, a handgun, and a shotgun and assault rifle on the couch. Id. The dog followed Klein inside and Klein

shut the door behind him**.** Doc. No. 50, at 15-18. Klein does not mention anything regarding the nature of the door opened by him.[26]

Klein's testimony relating to the order of events while in the backyard, including efforts at kenneling the dog and his discovery of the garage door being unlocked, is not sufficiently corroborated by Merrifield's testimony or other evidence. First, Merrifield did not corroborate Klein's version that a pre-entry plan existed. Merrifield testified to a discussion to remove the dog <u>after</u> visiting the fire site while the dog was roaming around loose in the yard and in their presence. Second, Merrifield's demeanor while testifying to the order of events in the backyard reflected a clear, definite recollection of proceeding directly to the site of the fire <u>before</u> taking steps to secure Blitz. He testified that the first thing he and Klein did was to proceed immediately to inspect the site of the fire because "we wanted to inspect -that was the main issue- the main threat to us at the moment" Doc. No. 56 at 82, 91, 97". Merrifield confirmed the fire was not a house fire, Doc. No. 56 at 92, and made sure there was no active fire. Id.  Third, Merrifield went on to testify that he and Klein "knew the fire department had to get back; so [they] decided it would be best to [then] secure the pit bull." Doc. No. 56 at 88-89. They tried to "corral it or call it over. It kind of responded - but ultimately we basically called it over and put it into the back of the house" . . . "[s]o the fire department could come back in and inspect the hole …". Doc. No. 56 at 89.

Merrifield's testimony, however, regarding attempts to kennel Blitz was unclear, uncertain and unconvincing and thus accorded little weight. When asked about efforts to 'kennel' Blitz, Merrifield did not readily recollect efforts to kennel the animal. His expression and body language reflected doubt as to what the question referred to and a complete lack of recollection of any significance of the kennel.[27] Merrifield was similarly

---

[26] See fn 12, supra.

[27] A follow-up response to a very guided question resulted in Merrifield's stating that he vaguely remembered trying to get the dog in the kennel. Doc. No. 56 at 92. The manner in which he responded strongly suggested he was uncertain and speculating. See, Doc. No. 56 at 92.

17cr2687-JAH

unsure 1) who put Blitz in the garage (and appeared to assume Klein did as they were the only two in the backyard at the time) and 2) who had the idea to put Blitz in the garage. See, Doc. No. 56 at 91-93.

The Court finds that considering the weight given to all the evidence, Klein's testimony as to events relating to circumstances surrounding his entry into the garage is based upon insufficiently corroborated facts and found to be incredible.[28]

### f. 'Fire During Fire Season' In San Diego County Is A Serious Matter

The Court is mindful that the possibility of a fire during fire season in San Diego County is a serious matter and is not taken lightly by this Court. However, the mere reference to "fire in fire season" cannot be accepted as law enforcement's talisman to write off Fourth Amendment prohibitions. As such, the mere fact that the incident occurred during 'fire season' does not, in and of itself, permit the warrantless entry by first responders. The non-consensual warrantless entry must still be supported by specific and articulable facts that establish there were objectively reasonable grounds to believe and emergency is at hand and immediate action is required. Cervantes, 219 Fed.3d. 882. Law enforcement's mere speculations are insufficient to justify its actions considering the protective restrictions imposed by the Fourth Amendment. Tarazon, 989 F.2d at 1049.

Otherwise, general propositions and routine responses and actions by law enforcement and other responders related to presumptive dangers would further erode the

---

[28] Additionally, Klein's account of reasons he entered the garage was sufficiently undermined by his track record within the Sheriff's Department evidenced by multiple disciplinary findings of improper report writing and other evidence. Klein's demeanor while testifying to internal findings and disciplinary actions, his rejection of the factual contents of the findings by internal investigators even where supported by video evidence, Doc. No. 57 at 143, or his lack of knowledge of underlying findings as well as excuses for established findings, See, e.g., Doc. No. 57 at 116-123 and 136, militate against his believability on matters not otherwise sufficiently corroborated. Other evidence also militates against the believability. See footnotes 5, 9, 12, and 24, supra.

17cr2687-JAH

significant restrictions and guarded protections of the Fourth Amendment. To the extent the Government suggest such a showing is legally sufficient, it is without merit as it paints too broad of an exception for Fourth Amendment purposes.

## CONCLUSION

For the foregoing reasons, Defendant had a legitimate privacy interest in his home, his backyard and the fire-damaged site; Defendant expressly refused to provide consent for the responders' entry; the responders knew or had reason to know there was no longer a structure fire as was initially reported; and there was no objectively reasonable assessment upon which responders reacted to justify their intrusion into his backyard. As such, it was not objectively reasonable for responders to believe that an emergency existed that fell within the realm of a fire exigency before the officers entered the Defendant's backyard. The court finds the Government failed to demonstrate specific and articulable facts that are sufficient to establish there were objectively reasonable grounds to believe "an emergency [was] at hand and immediate attention was required, LaLonde v. County of Riverside, 204 F.3d at 954; Cervantes, 219 Fed.3d. 882; Stuart, 547 U. S. 398, and that a warrant could not have been obtained in time." Tarazon, 989 F.2d at 1049.

Additionally, even if it was objectively reasonable for a responder to believe that the non-consensual entry into the backyard was necessary to abort an imminent danger of a fire spreading or re-occurring to the detriment of lives and property, the Court finds it was not objectively reasonable to remove Blitz from the backyard and into the garage in light of the deputies' updated assessment of the circumstances presented. And especially where, as here, they knew the fire was out and there was no evidence to establish there was no time for responders to secure a warrant.

There is no diminution in a person's reasonable expectation of privacy or in the protection of the Fourth Amendment simply because the official conducting the non-consensual entry is a firefighter, or a law enforcement officer assisting the firefighter - in the absence of a burning structure - to ascertain the cause of a fire. Tyler, 436 U.S. at 436 – 437. The showing to obtain an administrative warrant may vary and be less demanding

than that required for a traditional warrant, the necessity for the warrant persists. <u>Tyler</u>, 436 U.S. 505-506. All said, under these circumstances, Defendant's privacy interest in the residence and his refusal to consent made the entry into his backyard and home unreasonable absent a warrant. <u>Clifford</u>, 464 U.S. at 288.

Defendant's motion to suppress evidence is GRANTED.[29]

**IT IS SO ORDERED**.

DATED: April 1, 2019

JOHN A. HOUSTON
United States District Judge

---

[29] Due to the above findings, the Court has not specially addressed Defendant's motion to suppress based upon an unlawful arrest. It is denied as MOOT.

17cr2687-JAH